IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>**Plaintiff**,<br><br>v.<br><br>ELIGIO TRINIDAD-NOVA,<br><br>**Defendant.** | **Criminal No.** 22-419 (FAB) |

**OPINION AND ORDER**

BESOSA, District Judge.

Defendant Eligio Trinidad-Nova ("Trinidad") is charged in count one of his indictment, pursuant to 18 U.S.C. § 922(g)(5), for possessing a firearm and ammunition while "knowing that he was an alien illegally and unlawfully in the United States." (Docket No. 12.) Before the Court is his motion to dismiss, arguing that this statute is "a facially unconstitutional restriction on a person's Second Amendment right to bear arms." (Docket No. 24.) For the reasons that follow, the Court **DENIES** Trinidad's motion.

I.   BACKGROUND

The pertinent facts necessary to decide this motion are not disputed by the parties. See United States v. Musso, 914 F.3d 26, 29-30 (1st Cir. 2019). Most importantly, the parties agree that Trinidad is not a citizen of the United States. (Docket No. 24 at p. 2; Docket No. 28 at p. 3.) The parties also agree on the events

Criminal No. 22-419 (FAB)                                                    2

that led to his indictment:  on September 12, 2022, Puerto Rico law enforcement attempted to serve Trinidad with a "citation for interview," an interaction that ultimately led to his arrest and the search of his person.  (Docket No. 24 at p. 2; Docket No. 28 at pp. 2-3.)  The search discovered a Glock firearm, 9mm caliber ammunition, and a 9mm caliber magazine.  (Docket No. 24 at p. 2; Docket No. 28 at p. 3.)

Trinidad was indicted in count one pursuant to 18 U.S.C. § 922(g)(5) as a "prohibited person in possession of firearm and ammunition."  (Docket No. 12 at p. 1.)  Trinidad moves to dismiss this charge, arguing that the Supreme Court's recent decision, New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S.Ct. 2111 (2022), (hereinafter "Bruen"), which revised the framework for determining the constitutionality of firearm restrictions, makes this law unconstitutional.  (Docket No. 24.)  The government opposed the motion, (Docket No. 28), and Trinidad replied.  (Docket No. 32.)

II.   **LEGAL STANDARD**

Federal Rule of Criminal Procedure 12(b)(1) allows a party to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).   "[A] district court may consider a pretrial motion to dismiss an indictment where the government does

Criminal No. 22-419 (FAB)                                                3

not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts." Musso, 914 F.3d at 29–30 (quoting United States v. Weaver, 659 F.3d 353, 355 n* (4th Cir. 2011)).

### III. DISCUSSION

The Supreme Court's recent Bruen decision lays out a new test for determining the constitutionality of firearm regulations, rejecting the 'means-end' scrutiny approach developed in the circuit courts of appeals and regularly employed in constitutional analysis. 142 S.Ct. at 2125–30. Bruen instructs courts to employ instead the following two step test:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

Id. at 29–30.

To determine if the regulation is consistent with historical analogues, courts should look to "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." Id. at 2132–33 (citing McDonald v. Chicago, 561 U.S. 742, 767 (2010) and District of Columbia v. Heller, 554 U.S. 570, 599 (2008)). "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether

Criminal No. 22-419 (FAB)                                                    4

that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." Id. at 2133 (citations omitted).

Trinidad argues that section 922(g)(5) fails both steps of the Bruen test and is therefore unconstitutional. (Docket No. 24.) First, Trinidad argues that the plain text of the Second Amendment, which covers "the right of the people to keep and bear arms . . .," applies to him because he is a member of 'the people.' Id. at pp. 3—4. Second, he argues that blanket alien disarmament is a modern convention without historical analogue, considering that founding era laws were focused on those who posed a specific danger to others, and that immigrants were only disarmed as a group in the 20th century. Id. at pp. 4—7.

The government responds that pursuant to caselaw, 'the people' covered by the Second Amendment are "law-abiding citizens," or, at most, members of the "political community," and that Trinidad is neither. (Docket No. 28 at pp. 4—11.) Further, the government states that there are historical analogues to section 922(g)(5) sufficient to pass Bruen's step two. Id. at pp. 11—16.

**Bruen Step One**

The criminal statute at issue here states that "[i]t shall be unlawful for any person . . . who, being an alien [who is] is

Criminal No. 22-419 (FAB)                                                  5

illegally or unlawfully in the United States to . . . possess . . . any firearm or ammunition." 18 U.S.C. § 922(g)(5).  Pursuant to Bruen, then, the first question to ask is whether the plain text of the Second Amendment covers possession of firearms by certain aliens.  See Bruen, 142 S.Ct. at 2129—30.  The text of the Second Amendment of the United States Constitution states:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. CONST. amend. II.  In District of Columbia v. Heller, the Supreme Court held that the Second Amendment codifies an individual right to possess and carry weapons through its operative clause, "the right of the people to keep and bear Arms." Heller, 554 U.S. at 577—93.  Whether and to what extent aliens are considered part of "the people" is an open question.  Compare United States v. Meza-Rodríguez, 798 F.3d 664, 672 (7th Cir. 2015) ("In the post-Heller world, where it is now clear that the Second Amendment right to bear arms is no second-class entitlement, we see no principled way to carve out the Second Amendment and say that the unauthorized (or maybe all noncitizens) are excluded.") with United States v. Portillo-Muñoz, 643 F.3d 437, 442 (5th Cir. 2011), as revised (June 29, 2011) ("Whatever else the term means or includes, the phrase 'the people' in the Second Amendment of the Constitution does not include aliens illegally in the United States such as

Criminal No. 22-419 (FAB)                                                    6

Portillo, and we hold that section 922(g)(5) is constitutional under the Second Amendment.")

In the Fourth Amendment context, the Supreme Court previously stated in *dicta* that

> '[T]he people' seems to have been a term of art employed in select parts of the Constitution. . . . [Its uses] suggest[] that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.

United States v. Verdugo-Urquídez, 494 U.S. 259, 265 (1990).  In examining the Second Amendment specifically, the Heller court cited Verdugo-Urquídez approvingly, stating that "'the people,' . . . unambiguously refers to all members of the political community, not an unspecified subset."  Heller, 554 U.S. at 580.

Trinidad argues that he has sufficient connection to the United States to make him part of 'the people,' because he has resided in this country for 20 years, building a family that includes children born in the United States.  (Docket No. 24 at p. 4.)  The government argues that caselaw and the historical understanding of the right to bear arms show this right belongs only to citizens.  (Docket No. 28 at pp. 4-11.)

Several of the circuit courts of appeals that confronted this thorny issue before Bruen avoided construing this part of the

Criminal No. 22-419 (FAB)                                                          7

Constitution and assumed without deciding that aliens may be part of 'the people,' in order to examine the law under the now defunct 'means-end' scrutiny analysis.  See, e.g. United States v. Huitrón-Guízar, 678 F.3d 1164, 1169 (10th Cir. 2012) ("We think we can avoid the constitutional question by assuming, for purposes of this case, that the Second Amendment, as a 'right of the people,' could very well include, in the absence of a statute restricting such a right, at least some aliens unlawfully here—and still easily find § 922(g)(5) constitutional."); see also United States v. Pérez, 6 F.4th 448, 453 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1133 (2022); United States v. Torres, 911 F.3d 1253, 1257 (9th Cir. 2019); United States v. Jiménez-Shilon, 34 F.4th 1042, 1045 (11th Cir. 2022).  Because Bruen step two can similarly resolve the question presented, the Court will follow the path trod by those circuit courts of appeals and assume without deciding that the Second Amendment applies here and proceed to the next analysis. Cf. Huitrón-Guízar, 678 F.3d at 1169.

**Bruen Step Two**

Bruen instructs that if the conduct is covered by the Second Amendment, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  Bruen, 142 S.Ct. at 2129—30. Consistency is established by looking at "how and why the

regulations burden a law-abiding citizen's right to armed self-defense"[1] and whether historical regulations imposed a comparable and justified burden.  Id. at 2133.

Looking at how the regulation burdens the 'right to armed self-defense,' section 922(g)(5) is a complete ban on possession by a certain group of the population, persons illegally in the United States.  See 18 U.S.C. § 922(g)(5).  As to the 'why,' this restriction was part of a set of amendments passed in 1986 "to strengthen the Gun Control Act of 1968 to enhance the ability of law enforcement to fight violent crime and narcotics trafficking, and to improve administration of the Act."  H.R. REP. No. 99-495, at 1 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1327.[2]

The government argues that before, during, and after the American revolution there were analogous laws to disarm "nonmembers of the political community."  (Docket No. 28 at p. 12.)

---

[1] Bruen uses the phrase "law-abiding citizen" in reference to this right, but did not squarely address whether people who do not fit that category are covered by the Second Amendment.  See Bruen, 142 S.Ct. at 2134 ("It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects."); see also Meza-Rodríguez, 798 F.3d at 669 ("While some of Heller's language does link Second Amendment rights with the notions of 'law-abiding citizens' and 'members of the political community,' those passages did not reflect an attempt to define the term 'people.'  We are reluctant to place more weight on these passing references than the Court itself did.")(internal citations omitted).  Since the Court is assuming without deciding that aliens also have this right, the Court will apply the test to aliens regardless of the references to 'law-abiding citizens.'  Cf. Huitrón-Guízar, 678 F.3d at 1169.

[2] The Senate version of the bill, S. 49, became the law, Firearms Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986).

It cites as examples Massachusetts and Virginia, who forbade the arming of Native Americans, as well as that Virginia prohibited Catholics from owning arms unless they swore "allegiance to the Hanoverian dynasty and to the Protestant succession," consistent with the English understanding of fealty to the Church of England as a requirement to be a member of the English political community. Id. (quoting Robert H. Churchill, Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment, 25 L. & Hist. Rev. 139, 157 (2007)). The government also points out that several colonial governments disarmed persons who refused to "swear an oath of allegiance to the state or the United States." Id. (quoting Saul Cornell & Nathan DeDino, A Well Regulated Right: The Early American Origins of Gun Control, 73 Fordham L. Rev. 487, 506 (2004)).

In his reply, Trinidad disputes the applicability of these laws, calling them "a spotty history of disarming individuals along the lines of race and religion" and stating that they "certainly do not provide a well-established, longstanding history." (Docket No. 32 at p. 7.) Trinidad also reiterates that the idea of a political community exclusively endowed with Second Amendment rights is at odds with Heller's statement that the right to bear arms is an individual one. Id. at p. 6. Additionally, Trinidad

Criminal No. 22-419 (FAB)                                                     10

notes that regulating and criminalizing immigration occurred long after the drafting of the Bill of Rights.  Id.

 First, the fact the Heller explained that the right to bear arms is an individual right is not sufficient to answer the question of Bruen's step two.  Cf. Bruen, 142 S.Ct. at 2129—30.  And looking at the government's historical examples, it is clear that there is a tradition of disarming certain groups seen as threatening or suspect to the colonial social order.  See Natl. Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives, 700 F.3d 185, 200 (5th Cir. 2012), abrogated by Bruen, 142 S.Ct. 2111 ("'[T]he founders didn't think government should have the power to take away everyone's guns, but they were perfectly willing to confiscate weapons from anyone deemed untrustworthy,' a group that included law-abiding slaves, free blacks, and Loyalists.")  (quoting Adam Winkler, Gunfight: The Battle over the Right to Bear Arms in America 116 (2011)).  For right or wrong, "an early feature of the emerging republic was the disarmament of groups associated with foreign elements." Pratheepan Gulasekaram, "the People" of the Second Amendment: Citizenship and the Right to Bear Arms, 85 N.Y.U.L. Rev. 1521,

Criminal No. 22-419 (FAB)                                                  11

1548—49 (2010).³  From the stated purpose of the amendments that included what would become section 922(g)(5), the Court must infer that Congress believed that disarming "aliens illegally or unlawfully in the United States" would enhance law enforcement's ability to fight violent crime and narcotics trafficking.  See H.R. REP. No. 99-495, at 1.  Congress, thus, to some degree, deemed aliens without legal status to be untrustworthy and in need of disarming, akin to those groups disarmed at the time of the founding.  See Natl. Rifle Ass'n, 700 F.3d at 200.  "It is surely a generalization to suggest, as courts do . . . that unlawfully present aliens, as a group, pose a greater threat to public safety— but general laws deal in generalities."  Huitrón-Guízar, 678 F.3d at 1170 (internal citations omitted).

Secondly, while it is true that immigration statutes were not passed until decades after the founding, the government need only produce historical analogues, "not a historical *twin*" to establish

---

³ Trinidad points out and the Court agrees that Bruen step two puts the Court in the awkward position of using "racist and xenophobic legislation of the past" as justification for the current limiting of arguable constitutional rights. See Docket No. 32 at pp. 5—6; cf. Kanter v. Barr, 919 F.3d 437, 458 n.7 (7th Cir. 2019) (Barrett, J., dissenting) (noting the comparison to "race-based exclusions [that] would be unconstitutional today"); see also Adam Winkler, Heller's Catch-22, 56 UCLA L. Rev. 1551, 1564-65 (2009) (foreseeing the challenge of a hypothetical holding "that guns could only be regulated in ways similar to Founding-era gun control" and wondering about the "reaction if the Court had suggested that . . . states could selectively disarm groups of people on the basis of their political views or racial background."). Nevertheless, Congress may legislate based on alienage if it has a rational basis. See Mathews v. Díaz, 426 U.S. 67, 78—80 (1976); cf. Plyler v. Doe, 457 U.S. 202 (1982).

Criminal No. 22-419 (FAB)                                                    12

that total disarmament of aliens illegally in the United States is consistent with the "[n]ation's tradition of firearm regulation." Cf. Bruen, 142 S.Ct. at 2130—33 (emphasis in original). The government has produced sufficient historical analogues that show certain groups who were seen as 'untrustworthy' could be disarmed, which is analogous to the disarmament of certain aliens today. Cf. Natl. Rifle Ass'n, 700 F.3d at 200. Section 922(g)(5) is thus a constitutionally sound limit on firearm possession. See also United States v. Carbajal-Flores, 2022 WL 17752395, at *3 (N.D. Ill. Dec. 19, 2022) ("[T]he Court joins the Eleventh Circuit (and others) in concluding that the historical precedent from before, during, and after the founding shows a tradition of regulating noncitizens' right to keep and bear arms comparable to § 922(g)(5)."); United States v. DaSilva, 2022 WL 17242870, at *12 (M.D. Pa. Nov. 23, 2022) ("As discussed, *supra*, a substantial historical and traditional basis from the pre-Founding Era and Founding Era exists which provides well-established and representative historical analogues to § 922(g)(5) prohibiting an illegal alien from possessing a firearm and ammunition.").

**IV.   CONCLUSION**

For the reasons set forth above, Trinidad's motion to dismiss is **DENIED**.  (Docket No. 24.)

Criminal No. 22-419 (FAB)                                                    13

**IT IS SO ORDERED.**

San Juan, Puerto Rico, April 25, 2023.

                                            s/ Francisco A. Besosa
                                            FRANCISCO A. BESOSA
                                            SENIOR UNITED STATES DISTRICT JUDGE