**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

Plaintiff,

v.

ELIGIO TRINIDAD-NOVA,

Defendant.

CRIMINAL No. 22-419(FAB)

**REPORT AND RECOMMENDATION**

## I. PROCEDURAL BACKGROUND

On September 28, 2022, a federal grand jury indicted Eligio Trinidad-Nova ("Trinidad-Nova") on one count of knowingly possessing a firearm and ammunition as an illegal alien in violation of 18 U.S.C. § 922(g)(5) ("Section 922(g)(5)") and one count of improper entry by an alien in violation of 8 U.S.C. § 1325. ECF No. 12. On December 16, 2022, Trinidad-Nova moved to dismiss Count One of the indictment, arguing Section 922(g)(5) is a facially unconstitutional violation of the Second Amendment. ECF No. 24. On April 25, 2023, the Court denied Trinidad-Nova's motion to dismiss. ECF No. 41. On July 29, 2024, in light of the Supreme Court's decision in *United States v. Rahimi*, 602 U.S. ----, 144 S.Ct. 1889 (2024), Trinidad-Nova requested reconsideration of said order denying the motion to dismiss. ECF. 95. On August 1, 2024, Trinidad-Nova submitted a second motion to dismiss. ECF No. 97. The United States responded to the second motion to dismiss on August 23, 2024, and responded to the motion for reconsideration on August 26, 2024. ECF. Nos. 108, 109.

Trinidad-Nova's motion for reconsideration and second motion to dismiss were referred to the undersigned for a report and recommendation. ECF No. 105. For the reasons that follow, it is

recommended that Trinidad-Nova's motion for reconsideration and second motion to dismiss be DENIED.

## II. APPLICABLE LEGAL STANDARDS

### A. MOTIONS FOR RECONSIDERATION

Motions for reconsideration are not specifically authorized by statute or by the Federal Rules of Criminal Procedure. *See United States v. Ortiz*, 741 F.3d 288, 292 n.2 (1st Cir. 2014). However, the First Circuit Court of Appeals applies Federal Rule of Civil Procedure 59(e) to motions for reconsideration in the criminal context. *See, e.g.*, *United States v. Allen*, 573 F.3d 42, 53 (1st Cir. 2009).

Pursuant to Rule 59(e), a district court will only alter its original order if it is "evidenced by a manifest error of law, if there is newly discovered evidence, or in certain other narrow situations." *Biltcliffe v. CitiMortgage, Inc.*, 772 F.3d 925, 930 (1st Cir. 2014). A motion for reconsideration does "not provide a vehicle for a party to undo its own procedural failures [or] allow a party [to] advance arguments that could and should have been presented to the district court prior to judgment." *Iverson v. City of Bos.*, 452 F.3d 94, 104 (1st Cir. 2006) (citation omitted). However, the reviewing court has considerable discretion in deciding a motion for reconsideration. *Venegas-Hernández v. Sonolux Records*, 370 F.3d 183, 190 (1st Cir. 2004). "As a general rule, motions for reconsideration should only be exceptionally granted." *Villanueva-Méndez v. Nieves-Vázquez*, 360 F.Supp.2d 320, 323 (D.P.R. 2005).

### B. MOTIONS TO DISMISS

Federal Rule of Criminal Procedure 12(b)(1) allows a party to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Beyond technical defects and cases of misconduct, a federal court can exercise

its supervisory power and supplant the grand jury's "fundamental role" by dismissing an indictment only in "extremely limited circumstances." *Whitehouse v. U.S. Dist. Ct. for Dist. Of R.I.*, 53 F.3d 1349, 1360 (1st Cir. 1995) (citing *Bank of Nova Scotia v. United States*, 487 U.S. 2540, 263 (1998)). Defendants may not challenge the government's evidence, only the facial validity of the indictment. *United States v. Guerrier*, 669 F.3d 1, 3-4 (1st Cir. 2011) (citing *United States v. Eirby*, 262 F.3d 31, 37,38 (1st Cir. 2001)). However, the court may consider pretrial motions to dismiss an indictment "where the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts." *United States v. Musso*, 914 F.3d 26,30 (1st Cir. 2019) (quoting *United States v. Weaver*, 659 F.3d 353, 355 n* (4th Cir. 2011)).

## III. ANALYSIS

### A. MOTION FOR RECONSIDERATION

In Trinidad-Nova's motion for reconsideration, he asks the Court to reconsider the order denying his first motion to dismiss, in light of *Rahimi*, a Supreme Court case decided after the first motion to dismiss was denied. 602 U.S. ----,144 S.Ct. 1889 (2024). Specifically, Trinidad-Nova argues that *Rahimi*'s holding necessarily implies the Court erred at step two of the *New York State Rifle and Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022) framework for analyzing Second Amendment challenges. For the following reasons, the arguments raised in the motion for reconsideration are unpersuasive.

The Second Amendment provides, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The Supreme Court's standard for Second Amendment challenges provides as follows:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 597 U.S. at 17 (citation omitted). This new standard rejected the 'means-end' scrutiny approach developed by circuit courts of appeals and regularly used in constitutional analysis. *Id*. at 19.

The first step in a *Bruen* analysis is whether the Second Amendment's plain text covers an individual's conduct. "[T]he 'textual elements' of the Second Amendment's operative clause—'the right of the people to keep and bear Arms, shall not be infringed'—'guarantee the individual right to possess and carry weapons in case of confrontation.'" *Bruen*, 142 S. Ct. at 2134 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008)). Whether and to what extent aliens are considered part of "the people" within the context of the Second Amendment is an open question. The First Circuit has not resolved this question, but eight other circuit courts have considered the issue. The Fourth, Fifth, and Eighth Circuits have found that Second Amendment protections do not extend to undocumented immigrants. *See United States v. Carpio-León*, 701 F.3d 974 (4th Cir. 2012); *United States v. Portillo-Muñoz*, 643 F.3d 437 (5th Cir. 2011); *United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011). Other circuits have declined to conclusively rule on the issue while upholding Section 922(g)(5), noting that the Second Amendment may protect at least some undocumented immigrants. *See United States v. Pérez*, 6 F.4th 448, 453 (2d Cir. 2021) (assuming, without deciding, that undocumented immigrants have a constitutional right to possess firearms but finding Section 955(g)(5) to be a permissible restriction when applied to the facts of the case); *United States v. Torres*, 911 F3d 1253, 1257, 1261 (9th Cir.

2019) (assuming, without deciding, that the Second Amendment extends to unlawful aliens but concluding the statute is constitutional under intermediate scrutiny); *United States v. Huitrón-Guízar*, 678 F.3d 1164, 1169 (10th Cir. 2012) ("We think we can avoid the constitutional question by assuming, for purposes of this case, that the Second Amendment, as a 'right of the people,' could very well include, in the absence of a statute restricting such a right, at least some aliens unlawfully here–and still easily find § 922(g)(5) constitutional."); *United States v. Jiménez-Shilon*, 34 F.4th 1042, 1045–46 (11th Cir. 2022) (declining to "definitively decide whether Jimenez [an illegal alien] is among 'the people' " because, even assuming he is, as an illegal alien he "may be forbidden from bearing arms while living within our borders" without offending the Second Amendment). Only the Seventh Circuit has definitively found that the Second Amendment grants undocumented individuals the right to bear arms. *See United States v. Meza-Rodríguez*, 798 F.3d 664 (7th Cir. 2015) (finding an undocumented immigrant is protected by the Second Amendment but that Section 955(g)(5) nonetheless constitutes a permissible restriction).

The order denying the first motion to dismiss the indictment followed the lead of Second, Ninth, Tenth, and Eleventh Circuits and assumed, without deciding, that the Second Amendment applies to Trinidad-Nova and proceeded to the second step of the *Bruen* analysis. ECF No. 41 at 7. Moreover, in his motion for reconsideration, Trinidad-Nova only challenges the Court's analysis at step two. ECF No. 95 at 2. Thus, it is unnecessary to delve deeper into *Bruen*'s first step in order to address the merits of the motion for reconsideration.

The second step in the *Bruen* analysis requires the government to show that its desired Second Amendment restriction is consistent with America's history and tradition of firearm regulation. 597 U.S. at 17. Trinidad-Nova argues that the Court erred in accepting the

Government's proffered historical analogues because of the recent Supreme Court ruling in *Rahimi*, which clarifies *Bruen*'s step two:

> As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. A court must ascertain whether the new law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances). . .
>
> Why and how the regulation burdens the right are central to this inquiry. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding.

602 U.S. ----,144 S.Ct. at 1898 (cleaned up). The Supreme Court further opined that "some courts have misunderstood the methodology of our recent Second Amendment cases," which "were not meant to suggest a law trapped in amber." *Id*. at 1897. *Rahimi* emphasized that a modern regulation "must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.' " *Id*. at 1898. In this way, the Supreme Court re-emphasized *Bruen*'s guidance that a challenged regulation need not precisely match its historical precursors to be "analogous enough to pass constitutional muster." *Id*. at 1891 (quoting *Bruen*, 597 U.S. at 30).

In light of the holding in *Rahimi*, Trinidad-Nova assigns error to two specific parts of the order in question. First, Trinidad-Nova contends that *Rahimi* "accepts only statutes that require certain levels of specificity as appropriate analogues or current statutory prohibitions," and not generalities in the historical analogues. ECF 95 at 3-4. Second, Trinidad-Nova argues that the Court relied on and accepted a standard of "responsible" persons or "responsibility in general," that was specifically rejected by the Supreme Court in *Rahimi*. *Id*. at 4. This report will address each argument in turn.

### 1. *Rahimi*'s "Requirement" for Specificity

In *Rahimi*, the Supreme Court held that the prohibition on firearm possession while subject to a domestic violence restraining order in 18 U.S.C. § 922(g)(8) does not violate the Second Amendment. 144 S.Ct. at 1986-1903. The Supreme Court explained that Section 922(g)(8)'s constitutionality was supported by historical surety laws, which authorized "magistrates to require individuals suspected of future misbehavior to post a bond," and historical "going armed" laws, which "provided a mechanism for punishing those who had menaced others with firearms." *Id*. at 1900-01. Relying on these historical analogues, the Supreme Court held only that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id.* at 1903.

Trinidad-Nova interpreted this "narrow and specific" holding as creating "at least six separate and distinct requirements, all of which collectively require "specificity" in the assessment and finding of threat necessary to support a firearm prohibition consistent with the Second Amendment." ECF 95 at 5. Specifically, Trinidad-Nova contends that (1) an individual person must be found to be a threat for a specific reason; (2) the finding must be made by the court, (3) the threat must be determined to be credible; (4) the threat must be to physical safety; (5) of another; and (6) the resulting prohibition must be temporary in duration. *Id*. Trinidad-Nova contends that many of these requirements are not present in the Government's analogues or in the requirements of the statute itself. *Id*. Specifically, Trinidad-Nova argues that Section 922(g)(5) fails at each element above because it lacks an individualized and specific finding of threat, and that none of the historical analogues offered by the Government and accepted by the Court share any of the same features *Id*. at 9.

The *Bruen* analysis, however, is an inherently specific inquiry, tailored to the facts of each case. The test turns on an analysis of this the United States' historical tradition of firearm regulation as applied to the restriction challenged. That analysis will necessarily be different depending on the particular regulation contested, as "[w]hy and how the regulation burdens the right are central to this inquiry." *Bruen*, 597 U.S. 1 at 29. *Rahimi* made this even more clear, stressing that "if laws at the founding regulated firearm use to address *particular problems*, that will be a strong indicator that contemporary laws imposing *similar restrictions for similar reasons* fall within a permissible category of regulations." 144 S.Ct. at 1898 (emphasis added). As Justice Barrett emphasized in her concurrence, "imposing a test that demands overly specific analogues has serious problems." *Id*. at 1925.

*Rahimi*'s historical analysis is specific to Section 922(g)(8), looking to history for examples of preventing "individuals who threaten physical harm to others" from misusing firearms. *Id*. at 1896. The Supreme Court starts with the language of Section 992(g)(8) to orient itself as to what kind of historical analogues to review. *Id*. at 1899. It is from their tailored analysis of surety and going armed laws that the Supreme Court made their narrow and specific holding, "which involved judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon." *Id*. at 1902. Further, the language used in the Supreme Court's holding mirrors the language of the Section 992(g)(8), which lends further support that the holding was narrow to the challenged regulation.[1] Therefore, applying *Rahimi*'s specific holding to an entirely different context is inappropriate.

[1] A prosecution under Section 922(g)(8) may proceed only if the restraining order meets certain statutory criteria. In particular, the order must either contain a finding that the defendant "represents a credible threat to the physical safety" of his intimate partner or his or his partner's child, § 922(g)(8)(C)(i), or "by its terms explicitly prohibit[ ] the use," attempted use, or threatened use of "physical force" against those individuals, § 922(g)(8)(C)(ii).

*Rahimi* did not overturn *Bruen* or alter its Second Amendment analysis. The Supreme Court specifically stated that the opinion did not delineate "the full scope of the Second Amendment," but instead the holding encompassed only Section 992(g)(8). 144 S.Ct. at 1903. This runs counter to Trinidad-Nova's assertion that *Rahimi* creates a six-pronged test in a different scenario. ECF 95 at 5. If the Supreme Court created a new standard, let alone a six-step test by which to judge the constitutionality of restricting an individual's Second Amendment right, they would have clearly indicated so given the acknowledged history of courts misunderstanding "the methodology of [the Supreme Court's] recent Second Amendment cases." *Rahimi*, 144 S.Ct. at 1897. Furthermore, if the inquiry required an individualized assessment of risk or threat on the part of a particular person and a specific finding of threat by a court, as Trinidad-Nova alleges, the Supreme Court would not have written that their holding in *Rahimi* "does not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." 144 S.Ct. at 1901 (citing *Heller*, 554 U.S. at 626). For the aforementioned reasons regarding "specificity," reconsideration of the Court's order denying the first motion to dismiss is not warranted on these grounds.

**2. *Rahimi*'s Rejection of a Responsibility Standard**

Next, Trinidad-Nova argues that the Court and the Government, in their *Bruen* analysis, both rely on a "responsibility" standard that was rejected by the Supreme Court in *Rahimi*. ECF No. 95 at 8 (citing *Rahimi*, 144 S.Ct. at 1903). Specifically, Trinidad-Nova takes issue with two aspects of the order denying his first motion to dismiss: First, the Court's acceptance of historical analogues that "show certain groups who were seen as 'untrustworthy' could be disarmed" (ECF No. 41 at 12) and second, the Court's acknowledgment that "[i]t is surely a generalization to

suggest, as courts do… that unlawfully present aliens, as a group, pose a greater threat to public safety-but general laws deal in generalities." *Id*. at 11 (quoting *Huitrón-Guízar*, 678 F.3d at 1170).

In holding that Section 922(g)(8) was constitutional as applied to Rahimi, the Supreme Court rejected the Government's contention that Rahimi may be disarmed simply because he is not "responsible," noting that:

> "Responsible" is a vague term. It is unclear what such a rule would entail. Nor does such a line derive from our case law. In *Heller* and *Bruen*, we used the term "responsible" to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right. But those decisions did not define the term and said nothing about the status of citizens who were not "responsible." The question was simply not presented.

*Rahimi*, 144 S.Ct. at 1903 (internal citations omitted). Trinidad-Nova contends that the Court "explicitly accepted as sufficient, and based its ruling upon, a generalized concept of 'trustworthiness'," which is the same thing as responsibility. ECF No. 95 at 8. However, the Government's argument in *Rahimi* centered on a notion of a "law-abiding, responsible citizen," arguing that because "law-abiding" and "citizen" were accurate standards for other Section 922(g) provisions, "responsibility" was a workable standard for Section 922(g)(8). *See generally* Brief for United States, 2023 WL 7106695 at *13-14 (October 25, 2023). The Government in the case at bar, on the other hand, did not center their opposition to the motion to dismiss on standards of trustworthiness or responsibility. *See generally* ECF No. 28. A brief key-word search of their motion returns no results for "trustworthy" or "trustworthiness," and they only utilize language of "law-abiding, responsible citizens" in their argument at step one of the *Bruen* analysis in arguing that Trinidad-Nova is not part of "the people", which is not at issue in this motion for reconsideration. ECF No. 28 at 4.

Moreover, the Court's use of the word "trustworthy" in the opinion and order sought to be revisited is far from what the Supreme Court in *Rahimi* was referring to when it rejected the Government's contention that an individual could be disarmed "*simply* because he is not "responsible." 144 S.Ct. at 1903 (emphasis added). The Government in this case grounds its *Bruen* step two argument on the notion of a "political community," arguing that before, during, and after the American revolution there were analogous laws to disarm "nonmembers of the political community." *Id*. at 12. The Court accepted the Government's historical analogues, noting that it is "clear that there is a tradition of disarming certain groups seen as threatening or suspect to the colonial social order." ECF No. 41 (citing *Natl. Rifle Ass'n of Am., Inc. v. Bureau of Alcohol*, Tobacco, Firearms, and Explosives, 700 F.3d 185, 200 (5th Cir. 2012), abrogated by *Bruen*, 597 U.S. 1 ("'[T]he founders didn't think government should have the power to take away everyone's guns, but they were perfectly willing to confiscate weapons from anyone deemed untrustworthy,' a group that included law-abiding slaves, free blacks, and Loyalists.") (quoting Adam Winkler, Gunfight: The Battle over the Right to Bear Arms in America 116 (2011)). The Court's use of the word "untrustworthy" is not akin to basing its entire Order on a "generalized, vague, and unclear notion of trustworthiness" as Trinidad-Nova contends. ECF No. 95 at 8. Instead, the order's author based his decision at Bruen's second step on the Government's proffered historical precedent of disarming nonmembers of the political community, thereby joining the Eleventh Circuit and others in concluding that there exists a substantial historical and traditional basis providing well-established historical analogues to disarmament consistent with Section 922(g)(5). ECF. No. 41 at 12 (citing *United States v. Carbajal-Flores*, 2022 WL 17752395, at *3 (N.D. Ill. Dec. 19, 2022); *United States v. DaSilva*, 2022 WL 17242870, at *12 (M.D. Pa. Nov. 23, 2022)). Hence, the Court's utilization of the word "untrustworthy" is not the same as the Government's utilization of

the "responsibility" standard in *Rahimi*. Therefore, reconsideration is not warranted on this ground either.

### 3. *Bruen* Step Two Analysis

Trinidad-Nova requests in his motion for reconsideration that the *Bruen* step two analysis be undertaken again, incorporating *Rahimi*'s holding. Trinidad-Nova's challenge is a facial challenge to 18 U.S.C. § 922(g)(5). This is the "most difficult challenge to mount successfully," because it requires a defendant to establish that "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). That means that to prevail, the Government needs to demonstrate only that Section 922(g)(5) is constitutional in some of its applications. For the following reasons, the undersigned finds the Government's proffered analogues of the disarmament of those not within the "political community" sufficient under both *Bruen* and *Rahimi*.

*Bruen*, at step two, instructs that if the conduct is covered by the Second Amendment, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id. at 26.* Similarly, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* Further, "if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of

unconstitutionality." *Id.* "Courts are . . . entitled to decide a case based on the historical record compiled by the parties." *Id*. at 25 n. 6.

Some problems are "unimaginable at the founding." *Id*. at 28. However, courts must reason by analogy, as "judges [are] frequently tasked with answering these kinds of historical, analogical questions" and can "do the same for Second Amendment claims." *Id*. at 31. Consistency is established by looking at "how and why the regulations burden a law-abiding citizen's right to armed self-defense" and whether historical regulations imposed a comparable and justifiable burden. *Id*. at 29. In doing so, the government need only identify "a well-established and representative historical analogue, not a historical twin." *Id*. at 30; *see also Rahimi*, 144 S.Ct. at 1897-98 (finding that the Second Amendment "permits more than just those regulations identical to ones that could be found in 1791").

Section 922(g)(5) seeks to address the general problem of the possession of firearms by persons deemed by Congress to be too dangerous to the security of the community and the state. *See Pierret-Mercedes*, 2024 WL 1672034, at *9-12 (D.P.R. April 18, 2024) (J. Delgado-Colón) (canvassing the history of the prohibited person federal statutes). The order subject of the motion for reconsideration similarly found the "why" to be "to strengthen the Gun Control Act of 1968 to enhance the ability of law enforcement to fight violent crime and narcotics trafficking, and to improve administration of the Act." ECF No. 41 at 8 (citing H.R. REP. No. 99-495, at 1 (1986), reprinted in 1986 U.S.C.C.A.N. 1327, 1327). After identifying the "general societal problem," a determination as to whether the "problem" has persisted since the 18th century or if it implicates "unprecedented societal concerns" is pivotal, because in the case of the latter, there may not be a straightforward historical counterpart, in which case the court is instructed in *Bruen* to take into

account historical analogues that are "relatively similar" to the challenged regulation. 597 U.S. at 29.

The Government does not contend that "illegal immigration" was a "general societal problem persistent since the 18th century," because the "'unlawfulness' of a noncitizen's presence in the country seems to not have been a familiar legal concept in late 18th century." *Pierret-Mercedes*, 2024 WL 1672034, at *12 (D.P.R. April 18, 2024) (noting that nothing resembling federal immigration controls were in place until at least the late 19th century). Thus, the Court must proceed by historical analogy to regulations that are "distinctly similar" to the challenged regulation. *Bruen*, 597 U.S. at 29. *Rahimi* uses the term "relatively similar" but appears to reinforce this understanding of *Bruen*:

> [S]ome courts have misunderstood the methodology of our recent Second Amendment precedents.... As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition.... A court must ascertain whether the new law is "relevantly similar" to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances.

144 S.Ct. at 1897-98 (cleaned up). "Discerning and developing the law in this way is 'a commonplace task for any lawyer or judge.' " *Rahimi*, 144 S. Ct. at 1898 (citing *Bruen*, 597 U.S. at 28). Courts must analyze "principles" rather than looking for a "precise" match of the statute. *Id.* at 1904 (Sotomayor, J, concurring). Justice Barret likewise supported this analysis of principles. *Id*. at 1925 (Barrett, J., concurring) (" 'Analogical reasoning' under *Bruen* demands a wider lens: Historical regulations reveal a principle, not a mold.").

The Government contends that the "political community," through its elected representatives, has excluded undocumented immigrants from its membership:

> That illegal aliens remain outside the political community is reflected throughout the Constitution and federal law. Illegal aliens may not hold federal elective office,

> U.S. Const. art. I, § 2, cl. 2; id. art. I § 3, cl. 3; id. art. II, § 1, cl. 5, are barred from voting in federal elections, 18 U.S.C. § 611(a), may not serve on federal juries, 28 U.S.C. § 1865(b)(1), and are subject to removal from the United States at any time, 8 U.S.C. § 1227(a).

ECF No. 28 at 6 (citing *Pérez*, 6 F.4th at 463 (Menashi, J., concurring in the judgment); *see also Cabell v. Chavez-Salido*, 454 U.S. 432, 438-40 (1982) (observing that "citizenship . . . determin[es] membership in the political community" and that "[a]liens are by definition . . . outside of this community")). Courts have found that "the people" in the Second Amendment means "the political community." *E.g., United States v. Portillo-Muñoz*, 643 F.3d 437, 440 (5th Cir. 2011) (finding that Second Amendment did not protect any right of "illegal aliens" to bear arms because they are not part of "the political community"); *United States v. Carpio-León*, 701 F.3d 974, 975 (4th Cir. 2012) (same); *United States v. Pérez*, 6 F.4th 448, 451 (2d Cir. 2021) ("*Heller* suggested that 'the people' in the text of the Second Amendment is a term of art that refers to members of the 'political community.' ").

The Government points to three types of historical regulations of groups of people not considered part of the political community: Native Americans, Catholics, and those who refused to swear oaths of allegiance to the United States. ECF No. 28 at 9-13. The historical regulations provided by the Government are found to be "reflective of a concern among the Framer and their immediate predecessors that allowing firearms in the hands of specific classes of persons was dangerous to the integrity of the political community." *Pierret-Mercedes*, 2024 WL 1672034, at *21. Looking to "how" and "why" Section 922(g)(5) was enacted, in order to compare it to the "how" and "why" of the statutes that form part of the historical tradition of firearm regulations in the United States, the Court in *Pierret-Mercedes* carefully analyzed the same historical examples proffered by the Government in this case and concluded:

> Both Catholics in the colonial era as well as Native Americans up to and through ratification were considered "dangerous" on the basis that the[y] posed a threat to the state. This same idea motivated the allegiance statutes enacted during the Revolutionary War and in the decade after, aimed at those who could not be trusted to support the nascent state governments. In all, within the larger subset of dangerous persons, they represented a particular danger because of [ ] their perceived lack of loyalty to the government. The Second Amendment, as understood by the Framers in 1791, thus likely allowed the regulation of the possession of firearms by these types of persons, as they were outside of what was considered the political community at the time despite their physical presence in the national territory.

*Id*. The *Pierret-Mercedes* Court, as well as the order being challenged on the motion for reconsideration, concluded that the justification underlying these disarmament statutes was sufficiently similar to the motivation behind the enactment of Section 922(g)(5), finding the statute consistent with the United States' historical tradition of firearm regulations. *Id*. at 22; ECF No. 41. Moreover, the Supreme Court in *Rahimi*, clarified that its holding was not meant to "suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse…" 144 S.Ct. at 1891 (citing *Heller*, 554 U.S. at 626). Therefore, even considering *Rahimi*, the undersigned finds no reason to conclude differently. 144 S.Ct. at 1903. (internal quotations omitted).

**B. SECOND MOTION TO DISMISS**

Trinidad-Nova moves to dismiss Count One of the indictment as a violation of his Equal Protection and Due Process rights guaranteed under the Fifth Amendment to the Constitution of the United States. *Id*. at 1. First, Trinidad-Nova argues that when the Court denied his motion to dismiss brought pursuant to the Second Amendment and *Bruen*, it accepted the Government's racially and religiously based historical analogues in violation of his Equal Protection and Due Process constitutional rights. ECF No. 97 at 2. Second, relying on his interpretation of the Supreme Court's holding in *Rahimi*, Trinidad-Nova contends that with no finding of specific threat of

physical safety or any public safety concern, the decision to disarm Trinidad-Nova is based purely on his nationality in violation of the Equal Protection Clause of the Constitution of the United States. *Id*.

Trinidad-Nova's Equal Protections rights under *Plyler v. Doe*, 457 U.S. 202 (1982) are applicable to him and against the federal government through the Due Process clause of the Fifth Amendment "with equal force as the protections under the Fourteenth Amendment to all persons against state governments." ECF No. 97 at 1 (citing *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975)).[2] There is no dispute that undocumented immigrants are 'persons' for purposes of Fifth Amendment protections. *See Matthews v. Díaz*, 426 U.S. 67, 77 (1976) ("There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, liberty, or property without due process of law"); U.S. CONST. amend. V (No person shall ... be deprived of life, liberty, or property, without due process of law."). "[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976). However, for the following reasons, Trinidad-Nova's second motion to dismiss cannot carry the day.

A Second Amendment/*Bruen* inquiry involves reliance on historical analogues, which may sometimes put the Court in an awkward position of examining "racist and xenophobic legislation of the past" as justification limiting the scope on applicability of certain constitutional rights. *See* ECF No. 32 at 5-6; *cf. Kanter v. Barr*, 919 F.3d 437, 458 n.7 (7th Cir. 2019) (Barrett, J., dissenting)

---

[2] In *Plyler v. Doe*, the Supreme Court, held that "[a] Texas statute which withholds from local school districts any state funds for the education of children who were not 'legally admitted' into the United States, and which authorizes local school districts to deny enrollment to such children, violates the Equal Protection Clause of the Fourteenth Amendment." 457 U.S. at 202.

(noting the comparison to "race-based exclusions [that] would be unconstitutional today"). Trinidad-Nova quotes heavily from *United States v. Benito*, 2024 WL 3296944 (S.D. Miss. July 3, 2024) in support of his contention that acceptance of these analogues violates his Equal Protection rights. However, as Trinidad-Nova himself acknowledges, the quotes were written in the context of a strict Second Amendment/*Bruen* analysis, not an Equal Protection or Due Process one. ECF No. 97 at 4. Moreover, contrary to Trinidad-Nova's assertion that the Court accepted analogues based on protected classes "and absent any other possible justification," the Court did not *base* its analysis in this. ECF No. 97 at 8. Instead, the Court conducted the proper *Bruen* analysis, analyzing and eventually accepting historical analogues of disarmament of "nonmembers of the political community," who were seen as "threatening or suspect to the colonial social order." ECF No. 41 at 9-10. As the Court in *Pierret-Mercedes* eloquently put it:

> In arguing or applying *Bruen's* test, parties and judges certainly take the risk that recourse to such laws may be seen as tacit endorsements. But litigants and courts look to this history only to ascertain the breadth of the government's power to regulate firearms. A regulation that passes muster under *Bruen*'s vision of the Second Amendment may [fail] under other provisions of the Constitution.
>
> Therefore, while *Bruen* certainly creates a need to dig through history in search of validation, it does not validate what progress has clearly left behind. The analytical tightrope is a thin one, but it is certainly there for judges to walk.

2024 WL 1672034 at *25. Following the same analysis as the Court in *Pierret-Mercedes*, the Court's *Bruen* analysis in the case at hand did not violate Trinidad-Nova's Equal Protection and Due Process rights under the Fifth Amendment.

Separately, Trinidad-Nova argues that Section 922(g)(5) impermissibly discriminates on the basis of national origin in violation of the Fifth Amendment's Due Process Clause. Specifically, Trinidad-Nova contends that Section 922(g)(5) is not an alienage statute requiring rational basis review, but a firearm prohibition that "prohibits the simple possession of a firearm

on the basis of alienage and absent any finding of threat or dangerousness." ECF No. 97 at 9. Although, in the past, proxies have been used to discriminate on the basis of a protected class; that is not the case here. Section 922(g)(5) is not based on race or national origin, it is based on alienage: "[i]t shall be unlawful for any person… who, being an alien… is illegally or unlawfully in the United States" to ship, transport, possess, or receive any firearm or ammunition in or affecting interstate or foreign commerce. 18 U.S.C. § 922(g)(5)(A). Section 922(g)(5) specifies that the classification is based on alienage. *Id*. Further, not all aliens come from the same country or are the same race. Moreover, Section 922(g)(5)(A) necessarily implies that some aliens may be here legally or lawfully, which clarifies that this prohibition only applies to those who are here illegally, which highlights further that the statute is not based on race or nationality.

To the contrary, challenges to the Section 922(g)(5)(A) under equal protection/due process grounds have failed under rational-basis scrutiny, and Trinidad-Nova cannot show that there is no rational basis between prohibiting illegal aliens from bearing firearms and the legitimate government goal of public safety. *See e.g. United States v. Carpio-León*, 701 F.3d 974, 982 (4th Cir. 2012); *United States v. Huitrón-Guízar*, 678 F.3d 1164, 1167-70 (10th Cir. 2012). To the contrary, other circuits have recognized numerous reasons why it would be dangerous to permit illegal aliens to arm themselves. For example, illegal aliens are "harder to trace and more likely to assume a false identity[,] [o]r Congress may have concluded that those who show a willingness to defy our law are candidates for further misfeasance or at least a group that not be armed when authorities seek them." *Huitrón-Guízar*, 678 F.3d at 1170. Moreover, "those in the United States without authorization may be more likely to acquire firearms through illegitimate and difficult-to-trace channels, making [Section] 922(g)(5)(A)'s prohibition all the more reasonable." *United States v. Sitladeen*, 64 F.4th 978, 989 (8th Cir 2023). This rational basis is advanced by the Omnibus

Crime Control and Safe Street Act of 1968, responsible for Section 922(g)(5)'s enactment, finding that the possession of firearms by a certain class of persons, including "aliens who are illegally in this country" creates a burden on commerce, a threat to the safety of the President and Vice President of the United States, and a threat to the "effective operation of the Government." Pub. L. No. 90-351, 1201, § 82 Stat. 236. Unlike national origin or race, alienage is not a protected category, and the Supreme Court has "firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens." *Demore v. Kim*, 538 U.S. 510, 522 (2003); *see also Fiallo v. Bell*, 430 U.S. 787 (1977); *Matthews v. Díaz*, 426 U.S. 67, 80 (1976). Therefore, Trinidad-Nova's second motion to dismiss Count One on equal protection and due process grounds cannot succeed.

## IV. CONCLUSION

For the foregoing reasons, I recommend that Trinidad-Nova's motion for reconsideration and second motion to dismiss be DENIED.

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court within fourteen days of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

IT IS SO RECOMMENDED.

In San Juan, Puerto Rico, this 18th day of October, 2024.

s/Marcos E. López
U.S. Magistrate Judge